838 F.Supp. 729 (1993)
In re McDONNELL DOUGLAS EQUIPMENT LEASING SECURITIES LITIGATION.
Frank CARPI, as custodian for Stephen Carpi, Plaintiff,
v.
McDONNELL DOUGLAS CAPITAL INCOME FUND-I, McDonnell Douglas Capital Income IA, L.P., McDonnell Douglas Capital Income IB, L.P., McDonnell Douglas Capital Income IC, L.P., McDonnell Douglas Capital Income *730 ID, L.P., McDonnell Douglas Capital Income IE, L.P., McDonnell Douglas Capital Services, Inc., McDonnell Douglas Capital Corporation, McDonnell Douglas Finance Corporation, McDonnell Douglas Capital Leasing Corporation, McDonnell Douglas Corporation, Alan M. Forrester, Thomas F. Husband, John R. Chasteen, James T. McMillan, Thomas J. Lawlor, Jr., George M. Rosen, Donald V. Black, Daniel O. Anderson, and Gruntal & Co., Inc., Defendants.
Michael R. EDELMAN, Plaintiff,
v.
TROY LEASE INCOME FUND, Troy Capital Services, Inc., McDonnell Douglas Capital Corporation, McDonnell Douglas Finance Corporation, McDonnell Douglas Capital Leasing Corporation, MDCC Securities Corporation, McDonnell Douglas Corporation, Alan M. Forrester, John R. Chasteen, James T. McMillan, Thomas J. Lawlor, Jr., George M. Rosen, Donald V. Black, and Daniel O. Anderson, Defendants.
Richard WALDMAN, on his own behalf and on behalf of all others similarly situated, Plaintiff,
v.
TROY CAPITAL SERVICES, INC., McDonnell Douglas Capital Corporation, McDonnell Douglas Finance Corporation, McDonnell Douglas Corporation, and MDCC Securities Corporation, Defendants.
MDL No. 873, Nos. 90 Civ. 3448 (JMC), 90 Civ. 6968 (JMC), No. 90-72905-DT.
United States District Court, S.D. New York.
October 26, 1993.

*731 MEMORANDUM AND ORDER

CANNELLA, District Judge.
The proposed settlement is approved. Fed.R.Civ.P. 23(e). The joint application by plaintiffs' counsel for an award of attorney's fees is held in abeyance pending counsels' submission of (i) contemporaneous time records and expense reports, and (ii) affidavits concerning counsels' perceived risk of loss as of the commencement of the respective consolidated actions, and at each six-month anniversary from the commencement date of litigation, so as to assist the Court in computing a fair and equitable fee award.

BACKGROUND
The parties in the instant consolidated multidistrict action petition the Court for approval of a proposed settlement pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. The proposed settlement establishes a fund of $14,750,000, and calls for the liquidation of certain limited partnerships that are the subject matter of the actions. *732 In addition, plaintiffs' counsel submit a joint request for an award of attorney's fees in the amount of $4,000,000, and reimbursement of plaintiffs' litigation expenses in the amount of $68,604.42.
This consolidated multidistrict action consists of the following three actions: (1) a class action entitled Carpi v. McDonnell Douglas Capital Income Fund-I, 90 Civ. 3448 (JMC) (the "Carpi action"); (2) a class action entitled Edelman v. Troy Lease Income Fund, 90 Civ. 6968 (JMC) (the "Edelman action"); and (3) a purported class action entitled Waldman v. Troy Capital Services, Inc., No. 90-72905-DT (the "Waldman action"). Each of these actions arose out of the initial public offerings and sales of units of limited partnership interests in two related equipment leasing limited partnerships  the McDonnell Douglas Capital Income Fund ("MDCIF-I") and the Troy Lease Income Fund ("TLIF")  which together sold a total of approximately $85 million worth of units to investors. The plaintiffs allege that the prospectuses and offering materials disseminated in connection with the public offerings of units in these limited partnerships portrayed these investments as being conservative, and further indicated that investors would likely receive specified monthly distributions, and the return of their capital at the end of the stated seven-year investment period. Plaintiffs also allege that, notwithstanding such statements within the offering materials, within the first two years of the limited partnerships' operations, the partnerships announced that investors would not be receiving any return on their investment, that investors were unlikely to recover their capital investments therein, and that substantial writedowns of assets would be made in the books and records of the defendant partnerships. Plaintiffs further allege that the high-risk nature of these investments was known to the defendants, and that the limited partnerships, contrary to the representations contained in the offering materials, acquired obsolete and outdated computer and computer-related equipment for leasing at prices far above market value.
The actions were brought on behalf of unitholders in the limited partnerships under the federal securities laws and the common law alleging that the offering materials contained certain misrepresentations and omissions. Plaintiffs allege violations of Sections 11, 12(2) and 15 of the Securities Act of 1933, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, and the common law. (The Waldman action also asserts a violation of the federal racketeering statute.)
The Carpi action was the first of the instant consolidated actions to be filed. The Carpi action, which was filed as a class action in the Court in May 1990, asserts claims under the federal securities laws and the common law arising out of the offering and sale, in late February 1988, of $50,000,000 in units of limited partnership interests in the five equipment leasing partnerships sponsored by McDonnell Douglas Capital Corporation ("MDCC") that comprise McDonnell Douglas Capital Income Fund-I ("MDCIF-I"). The five limited partnerships are McDonnell Douglas Capital Income IA, L.P. ("MDC-1A"), McDonnell Douglas Capital Income IB, L.P. ("MDC-1B"), McDonnell Douglas Capital Income IC, L.P. ("MDC-1C"), McDonnell Douglas Capital Income ID, L.P. ("MDC-1D"), and McDonnell Douglas Capital Income IE, L.P. ("MDC-1E") (referred to collectively as the "MDCI Partnerships"). The defendants in the Carpi action, as denominated through their relationship to MDCIF-I, are: (A) MDCIF-I; (B) each of the MDCI Partnerships, (C) McDonnell Douglas Capital Services, Inc. (n/k/a Troy Capital Services, Inc. ("TCS")  the "general partner" in each of the five MDCIF-I limited partnerships, (D) the parent and affiliates of the general partner which include MDCC, McDonnell Douglas Finance Corporation ("MDFC"), McDonnell Douglas Capital Leasing Corporation ("MDCLC"), and McDonnell Douglas Corporation ("MDC"); (E) the various present or former officers of the general partner and its parent and affiliates, including John R. Chasteen, James T. McMillan, Thomas J. Lawlor, Jr., George M. Rosen, Donald V. Black, Daniel O. Anderson, Alan M. Forrester, and Thomas F. Husband; and (F) Gruntal & Co., Inc. ("Gruntal"), the managing underwriter and dealer-manager for the initial public offering of units in MDCIF-I. *733 Plaintiff alleges that each of the individual defendants, other than Forrester, Chasteen and Husband, have been associated with MDFC. Plaintiff further alleges that Forrester, Chasteen and Husband were officers and directors of MDCC throughout the period relevant to the merits of the Carpi action.
The Edelman action, which was filed as a class action in the Court in October 1990, asserts claims under the federal securities laws and the common law arising out of the offering and sale, in October 1988, of $35,000,000 in units of limited partnership interests in a similar equipment leasing partnership sponsored by MDCC known as Troy Lease Income Fund ("TLIF").
The Waldman action asserts claims which are similar to the claims in the Edelman action. The Waldman action was originally filed as a class action in the United States District Court for the Eastern District of Michigan in October 1990, and was subsequently transferred to the Court by the Judicial Panel on Multidistrict Litigation for coordinated or consolidated pretrial proceedings. The Waldman action asserts claims under the federal securities laws and the common law, as well as the federal racketeering statute, arising out of the offering and sale of units of limited partnership interest in TLIF.

THE PROPOSED SETTLEMENT AND NOTICE TO CLASS MEMBERS
The proposed settlement of the instant actions has two components: (1) the creation of a $14,750,000 settlement fund; and (2) the liquidation of the defendant limited partnerships. The $14,750,000 settlement fund is comprised of (a) a payment of $13,375,000 by or on behalf of all defendants other than Gruntal (the "McDonnell Douglas defendants") to settle the claims in all of the consolidated actions, and (b) a payment of $1,375,000 by Gruntal to settle the claims in the Carpi action alone.[1] The $13,375,000 payment by or on behalf of the McDonnell Douglas defendants is to be allocated among all the partnerships in accordance with a formula designed to equalize the overall recoveries (other than the Gruntal recovery) to investors who purchased their interests in the initial offerings of units and who held their units through the time of the liquidating distribution to each partnership. The $1,375,000 to be paid by Gruntal will be allocated pro rata solely among each of the MDCI Partnerships based on the number of units sold by the MDCI Partnerships.
The second component of the proposed settlement is the liquidation of the limited partnerships. This component involves a series of integrated transactions, which through subsequent adjustments, could return additional benefits to the class members. Stated in greater detail, the liquidation of the limited partnerships is to be accomplished by: (a) the proposed sale of each partnership's equipment, subject to any related leases and any related indebtedness, to MDCC or its designee or designees; (b) the waiver of the terms of the Amended and Restated Agreement of Limited Partnership of each partnership to the extent necessary to permit the sale; and (c) the dissolution and liquidation of the limited partnerships following the aforementioned sale, including the distribution to the limited partners of the proceeds of the sale of the partnerships' equipment portfolios and all cash and cash equivalents of the partnerships. As a condition of the settlement, this integrated proposal had to be approved by a majority of the limited partners of each of the partnerships pursuant to the partnerships' respective partnership agreements. Accordingly, the general partner solicited the consents of the limited partners to the proposal, and provided a 149-page information statement to each limited partner in connection therewith. The proposal was ultimately approved by a majority of the limited partners of each of the defendant partnerships.
The liquidation of the partnerships may result in the return of additional benefits to the plaintiffs beyond those benefits payable from the $14,750,000 settlement fund. Pursuant to the proposed settlement, MDCC (or its designee or designees) will purchase the equipment portfolio of each partnership at a price (the "purchase price") equal to 110% of the aggregate net book value of such partnership's *734 equipment portfolio (as such book value appears in the financial statements of such partnership at the time of the sale, but without reflecting any write downs of equipment values after August 31, 1992) (the "portfolio value"), subject, to increase or decrease based upon the proceeds received by MDCC (or its designee or designees) from rentals (but not in excess of depreciation expense), from equipment sales and from the resale of such equipment portfolio to a third party (collectively, the "MDCC proceeds"). On the date of the sale of a partnership's equipment portfolio to MDCC, MDCC or its designee or designees will pay the purchase price for such equipment portfolio, less an amount (the "holdback") equal to 10% of the purchase price (i.e., 11% of the portfolio value) and such partnership will distribute all of its cash and cash equivalents on hand (including the purchase price, less the holdback) to its limited partners. When such equipment portfolio is resold by MDCC or its designee or designees, the purchase price will be adjusted as follows:

Amount of MDCC Proceeds Adjustment of Purchase
 Price
99% or less of Portfolio MDCC retains Holdback;
Value. Purchase Price is adjusted
 to reflect retention.
Greater than 99%, but not Excess over 99% of Portfolio
more than 110% of Portfolio Value is payable to
Value. Partnership from Holdback;
 MDCC retains balance
 of Holdback; Purchase
 Price is adjusted to
 reflect retention.
Greater than 110%, but not Holdback plus 60% of excess
more than 120% of Portfolio over 110% of Portfolio
Value. Value is payable to Partnership;
 Purchase Price is
 adjusted to reflect additional
 payment.
Greater than 120%, but not Holdback plus 6% of Portfolio
more than 130% of Portfolio Value plus 50% of excess
Value. over 120% of Portfolio
 Value is payable to Partnership;
 Purchase Price is
 adjusted to reflect additional
 payment.
More than 130% of Portfolio Holdback plus 11% of
Value. Portfolio Value is payable
 to Partnership; Purchase
 Price is adjusted to reflect
 retention.

Thus, pursuant to the proposed plan of liquidation, the limited partners are guaranteed a minimum recovery of 99% of the portfolio value and can recover as much as 121% of the portfolio value.
Pursuant to the settlement, the McDonnell Douglas defendants have also agreed to pay a number of costs that would otherwise be chargeable against the settlement fund. Included among these costs are: (a) all costs of mailing the notice of proposed settlement to members of the classes and the cost of publishing a summary notice in the national editions of The Wall Street Journal and The New York Times; (b) all costs of distribution of the net fund; (c) the fee and expenses of the financial consulting firm of Duff & Phelps, it being agreed, pursuant to the settlement, that plaintiffs' lead counsel would select and retain an independent financial advisor to render financial advice and assistance to plaintiffs and to provide them with an opinion as to the fairness, from a financial point of view, of the purchase price to be paid to the partnerships for the equipment portfolios in the sale, and with Duff & Phelps being the firm so selected; and (d) all costs associated with the consent solicitation, including the costs of preparing, printing and mailing the accompanying information statement. These costs and expenses borne, and to be borne, by the McDonnell Douglas defendants will not reduce the settlement fund to be distributed to the limited partners.
The Court finds that the aggregate noncontingent pecuniary benefits of the settlement that will accrue to the class members total approximately $16,185,385.50. The Court has computed this amount by adding together the following components of the settlement:
(1) The amount of $14,750,000, to be paid by the McDonnell Douglas defendants and Gruntal, constituting the settlement fund;
(2) The amount of $160,000 paid by the McDonnell Douglas defendants for the retention by plaintiffs' counsel of the firm of Duff & Phelps to render financial advice on behalf of the class members;
(3) The amount of approximately $180,000 for the administrative and notice-related costs paid by the McDonnell Douglas defendants, including the printing and mailing of the 149-page information statement;
*735 (4) The amount of $616,131, representing the benefit to the class members of receiving their pro rata share of the partnerships' cash and non-cash assets pursuant to the settlement now, instead of in 1995 (the end of the stated investment period for the partnerships), assuming that the class members immediately reinvested their respective liquidating distributions in 2-year treasury bills. See Affidavit of Robert M. Kornreich in Support of Proposed Settlement and in Support of Plaintiffs' Counsel's Request for an Award of Attorneys' Fees and Reimbursement of Expenses, at Exhibit 2, In re McDonnell Douglas Equip. Leasing Sec. Litig., MDL No. 873 [hereinafter Kornreich Aff.].
(5) The amount of $479,254.50, representing the increased consideration to be received by the classes as a result of plaintiffs' counsels' settlement negotiations concerning the sales price of the limited partnerships' equipment portfolios. This amount is the difference between the minimum guaranteed liquidation proceeds resulting from the sale of the limited partnerships' equipment portfolios pursuant to the settlement, valued at 99% of their net book value as of June 30, 1993, the date used in the information statement ($1,977,057), and the amount of liquidation proceeds, representing 75% of such net book value, that the McDonnell Douglas defendants offered to pay in a proposed sale of the equipment portfolios in an unnegotiated liquidation of the partnership ($1,497,802.50). See Kornreich Aff., supra, ¶ 37(e), at 28. The Court also regards this element as a benefit to the class members for purposes of establishing a common fund.
This total noncontingent pecuniary benefit of $16,185,385.50 does not include the contingent benefits that would vest in the limited partners if, pursuant to the plan of liquidation, the equipment portfolios are sold by or on behalf of MDCC at a price above 99% of the equipment portfolios' net book value as of June 30, 1993. Pursuant to the proposed settlement, the limited partners can potentially receive up to 121% of the net book value of the equipment portfolios. See supra.
Without considering reductionary adjustments attributable to the time value of money, plaintiffs' lead counsel, in his affidavit supporting this proposed settlement, has attested that by adding together (1) the amount of monthly distributions previously received by the limited partners, plus (2) the amount of the liquidating distribution that the class members are expected to receive pursuant to the settlement, plus (3) the amount of the fund created through the settlement, members of the MDCIF-I Class will have recovered 97.44% of their initial investment in MDCIF-I, and that members of the TLIF Class will have recovered 95.62%[2] of their capital investment in TLIF after subtracting counsels' requested fee award of $4,000,000.[3]See Kornreich Aff., supra, ¶ 39, at 29.
On June 14, 1993, the Court entered a consent order with respect to the providing of notice, the settlement hearing, and the administration of the instant actions. This consent order modified the definitions of the classes certified in the Carpi[4] and the Edelman[5] *736 actions, and directed TCS, as general partner of the partnership comprising MDCIF-I, and TLIF to notify, at their expense, all members of the MDCIF-I Class and TLIF Class that could be identified from the records of TCS of the pendency of the instant actions, and the proposed settlements thereof, as follows: (1) by mailing a copy of the Notice of Pendency of Class Action and Settlement to the addresses of each member of the MDCIF-I Class and TLIF Class, as set forth in the records of TCS; and (2) by publication of a summary notice, once each in the national editions of The Wall Street Journal and The New York Times, at least 45 days prior to the date of the settlement hearing. The Court noted that this manner of providing notice constituted the best notice practicable under the circumstances, and constituted due and sufficient notice of the consent order, the class certifications, and the settlement hearing related thereto, to all persons affected by and/or entitled to participate in the settlement, in full compliance with the notice requirements of Rule 23 of the Federal Rules of Civil Procedure.
The consent order further directed TCS to provide, at its own expense, in connection with the solicitation of consents from the limited partners, a copy of an information statement to all members of the MDCIF-I and the TLIF classes who were owners of units of limited partnership interest in MDCIF-I and TLIF as of the record date set forth in such information statement.
The Court, in the consent order, also scheduled a hearing for September 14, 1993 to consider the fairness, reasonableness, and adequacy of the proposed settlement; the dismissal of each of the actions, with prejudice; plaintiffs' counsels' request for attorney's fees and reimbursement of expenses; and other related matters. Pursuant to the consent order, as a prerequisite to entering an appearance at this hearing, a person had to (a) file with the Clerk of the Court a notice of such person's intention to appear, together with a statement indicating the basis for such opposition, along with any supporting documentation, and (b) serve copies of such notice, statement, and documentation, together with copies of any other papers or briefs such person filed with the Court, in person or by mail, upon plaintiffs' lead counsel and the counsels for the defendants.
The consent order also specified the procedures for opting out of the settlement. According to the consent order, all requests for exclusion by members of the MDCIF-I Class and the TLIF Class were required to be in writing, to contain certain information, and to be postmarked by August 31, 1993.
Plaintiffs' lead counsel has attested to, and has offered documentary evidence in support of the parties' compliance with all elements of the consent order, including the mailing of notice to all class members, along with the 149-page information statement, and publication of a summary notice of settlement, on July 20, 1993, in the national edition of The Wall Street Journal, and on July 22, 1993, in the national edition of The New York Times. Plaintiffs' lead counsel, in his affidavit, has further attested that the McDonnell Douglas defendants have the current addresses of the class members, and that it is virtually certain that nearly all class members would have actually received the notice through mail. See Kornreich Aff., supra, ¶ 45, at 31-32.
Only two unitholders, owning 145 units in the aggregate, have requested exclusion from the MDCIF-I Class. No persons have opted out of the TLIF Class.
The Court held a settlement approval hearing on September 14, 1993. No person appeared at this hearing to oppose the settlement. As of the date of this Memorandum and Order, the Court has received four letters, *737 each dated subsequent to the date of the settlement hearing, in opposition to the settlement and plaintiffs' counsels' joint application for attorney's fees.
For the reasons detailed below, the Court approves the settlement, but holds counsels' joint request for attorney's fees and reimbursement of expenses in abeyance.

DISCUSSION

I. Settlement

The approval of a settlement in a class action or a derivative suit is a matter of discretion for the trial court. See In re Ivan F. Boesky Sec. Litig., 948 F.2d 1358, 1368 (2d Cir.1991); In re Warner Communications Sec. Litig., 798 F.2d 35, 37 (2d Cir.1986); Newman v. Stein, 464 F.2d 689, 692 (2d Cir.), cert. denied, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972); Breiterman v. Roper Corp., [1989-1990 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 94,885, at 94,831, 1990 WL 15535 (S.D.N.Y. Jan. 12, 1990) (citing Stull v. Baker, 410 F.Supp. 1326, 1332 (S.D.N.Y. 1976)). In evaluating a proposed settlement, the court must determine whether "`the compromise is fair, reasonable and adequate.'" In re Masters Mates & Pilots Pension Plan and IRAP Litig., 957 F.2d 1020, 1026 (2d Cir.1992) (quoting Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983)). Mindful of the public policy concerns  including the finite nature of judicial resources  that favor settlements, yet cognizant of the potentially vulnerable position of dissenting class members, the court's role "is to reach an objective, educated estimate of the complexity and probable success of full litigation, together with all other factors relevant to a fair evaluation of the wisdom of the proposed compromise." In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.), 607 F.Supp. 1312, 1320 (S.D.N.Y.1985) (citation omitted). In so doing, the district court "has the fiduciary responsibility of ensuring that the settlement is fair and not a product of collusion, and that class members' interests were represented adequately." Warner Communications, 798 F.2d at 37 (citations omitted).
The standards governing a proposed class action settlement have been articulated by this Court as follows:
First, the proponents have the burden of proving that (1) the settlement is not collusive but was reached after arm's length negotiations; (2) the proponents are counsel experienced in similar cases; (3) there has been sufficient discovery to enable counsel to act intelligently; and (4) the number of objectants or their relative interest is small. If the proponents establish these propositions, the burden of attacking the settlement then shifts to the objectants, if any. Finally, the Court must approve the settlement only after finding it to be reasonable in light of the plaintiffs' ultimate probability of success in the lawsuit.
Breiterman, [1989-1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,885, at 94,831 (citing Krasner v. Dreyfus Corp., 90 F.R.D. 665, 667 (S.D.N.Y.1981)). In addition to these requirements, the court must be satisfied that notice has been provided to all class members in accordance with the manner that the court has directed. See Fed.R.Civ.P. 23(e) ("notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.").
The Court finds that the proponents have met their initial burden of proving that the settlement is not collusive, that the proponents are counsel experienced in similar cases, that there has been sufficient discovery to enable counsel to act intelligently, and that the number of objectors or their relative interest is small. The settlement was reached after more than two years of arm's length negotiations. Many of these negotiations were conducted at conferences presided over by Magistrate Judge Leonard Bernikow. In addition, the negotiations were conducted by competent counsel with extensive experience in securities litigation. Further to this point, in analyzing a proposed settlement, "[c]ourts have consistently refused to substitute their business judgment for that of counsel, absent evidence of fraud or overreaching." Oppenlander v. Standard Oil Co. *738 (Indiana), 64 F.R.D. 597, 624 (D.Colo.1974). The record reveals no evidence of fraud or overreaching. Moreover, the parties entered into the proposed settlement after having completed sufficient discovery. Defendants and nonparty witnesses have reviewed approximately 70,000 pages of documents. Depositions were also taken of the individual defendants, as well as the key employees and agents of the McDonnell Douglas defendants and Gruntal. Finally, although two members of the MDCIF-I Class opted-out, no class members appeared at the settlement hearing to oppose the settlement, or filed a formal objection prior to the date specified in the notice of proposed settlement that was sent to them.[6]
The Court is also satisfied that notice has been provided to all class members in accordance with the manner that the court directed. The Court's consent order dated June 14, 1993, directed TCS, as general partner of the partnership comprising MDCIF-I, and TLIF to notify, at their own expense, all members of the MDCIF-I Class and TLIF Class that could be identified from the records of TCS of the pendency of the instant actions, and the proposed settlements thereof. According to the consent order, such notice was to be accomplished (1) by mailing a copy of the Notice of Pendency of Class Action and Settlement to the addresses of each member of the MDCIF-I Class and TLIF Class, as set forth in the records of TCS; and (2) by publication of a summary notice, once each in the national editions of The Wall Street Journal and The New York Times, at least 45 days prior to the date of the settlement hearing. The Court noted that this manner of providing notice constituted the best notice practicable under the circumstances, and constituted due and sufficient notice of the consent order, the class certifications, and the settlement hearing related thereto, to all persons affected by and/or entitled to participate in the settlement, in full compliance with the notice requirements of Rule 23 of the Federal Rules of Civil Procedure. As earlier discussed, plaintiffs' lead counsel has attested to, and has offered documentary evidence in support of the parties' compliance with all elements of the consent order, including the mailing of notice to all class members, along with an accompanying information statement, and publication of a summary notice of settlement, on July 20, 1993, in the national edition of The Wall Street Journal, and on July 22, 1993, in the national edition of The New York Times. Plaintiffs' lead counsel, in his affidavit, has further attested that the McDonnell Douglas defendants have the current addresses of the class members, and that it is virtually certain that nearly all class members would have actually received the notice through mail. See Kornreich Aff., supra, ¶ 45, at 31-32.
Insofar as the proponents of the settlement have met their initial burdens, the Court now turns to assess whether the settlement is reasonable in light of plaintiffs' probability of success on the merits. In undertaking this analysis, courts within the Second Circuit "`have not applied any single, inflexible test.'" Breiterman, [1989-1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,885, at 94,831 (quoting Krasner, 90 F.R.D. at 667). Rather, courts have considered the following relevant factors:
(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.
City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir.1974) (citations omitted); Breiterman, [1989-1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,885, at 94,831. *739 In applying these numerous factors, the Court is mindful that it need "not decide the merits of the case or resolve unsettled legal questions." Carson v. American Brands, Inc., 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981).
The application of the above factors to the instant actions leads the Court to conclude that the proposed settlement is fair, reasonable, and adequate to the class members, and should therefore be approved by the Court.
As earlier discussed, the proposed settlement was reached after sufficient discovery had been undertaken by plaintiffs' counsel to enable them to thoroughly evaluate their case. Thus, the Court finds that counsel negotiated the settlement with substantial knowledge of the factual intricacies necessary to analyze the relative strengths and weaknesses of the parties' legal positions.
The value of the benefits conferred upon the class members as a result of the settlement, as compared to the maximum possible recovery that the class members could receive if the case proceeded to trial, also weighs in favor of the Court's approval of the settlement. According to the affidavit submitted by plaintiffs' lead counsel, in evaluating the damages suffered by the class members in the instant actions, plaintiffs' counsel preliminarily concluded that the remedy of rescissory damages, provided for by Section 12 of the Securities Act of 1933, 15 U.S.C.A. § 771 (West 1981),[7] constituted the most favorable measure of the class members' losses since the award of such damages would seek to place investors in the same position they were in prior to their investment in the partnerships. See Kornreich Aff., supra, ¶ 56, at 37. At hearings before Magistrate Judge Bernikow, plaintiffs expressed their belief that the maximum potential damages to the classes totaled approximately $30 million. See id. Thus, the total noncontingent benefit of $16,185,385.50 that the proposed settlement would confer upon the class members constitutes slightly less than 54 percent of this purported ceiling upon the class members' recovery. The Second Circuit, in Grinnell, instructed that "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." Grinnell, 495 F.2d at 455. While the logical import of this pronouncement does not instruct a district court to rubber stamp proposed settlements in which the class members will recover more than 50 percent of their maximum potential recovery, in the instant actions, in view of the risks inherent in further litigation, including the additional costs of such litigation and "the substantial legal and factual hurdles which the [c]lass plaintiffs would have been required to overcome with respect to both liability and damages",[8]In re Michael Milken *740 and Associates Securities Litigation, 150 F.R.D. 57, 64 (S.D.N.Y.1993), the Court concludes that the relative value of the benefits achievable through settlement weighs in favor of a finding that the proposed settlement is reasonable, fair, and adequate to the class members.[9]
The complexity, expense, and likely duration of further litigation also weigh in favor of the Court's approval of the settlement. Interwoven in the question of complexity are such factors as "the risks of establishing liability," "the risks of establishing damages," and "the risks of maintaining the class action through the trial." Grinnell, 495 F.2d at 463 (citations omitted). In evaluating the settlement of a securities class action, courts have recognized that such litigation "`is notably difficult and notoriously uncertain.'" Kazanas v. Millicom, Inc., [1992-1993 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,255, at 95,149, 1992 WL 237358 (S.D.N.Y. Sept. 17, 1992) (quoting Lewis v. Newman, 59 F.R.D. 525, 528 (S.D.N.Y.1973)). As one court in this district stated:
It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced. Merely by way of example, two instances in this Court may be cited where offers of settlement were rejected by some plaintiffs and were disapproved by this Court. The trial in each case then resulted unfavorably for plaintiffs; in one case they recovered nothing and in the other they recovered less than the amount which had been offered in settlement.
West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710, 743-44 (S.D.N.Y.1970), aff'd, 440 F.2d 1079 (2d Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). In addition, the Court acknowledges the additional risks posed to the class members in the instant actions through (i) the erosion of any recovery, in real terms, as a result of the time value of money, and (ii) the further risk that the net asset values of the partnerships' equipment portfolios could diminish over time and therefore reduce the liquidation values thereof. Accordingly, the Court finds that the complexity, expense, and likely duration of further litigation weigh in favor of the approval of the proposed settlement.
The views of counsel, likewise, weigh in favor of the Court's approval of the proposed settlement. The law firms that have actively prosecuted this litigation have extensive experience in securities class action litigation and have expressed their own opinion that the proposed settlement is fair, reasonable and adequate. The opinion of such experienced and competent counsel in favoring a settlement is consequently accorded great weight. See Weinberger v. Kendrick, 698 F.2d 61, 75-76 (2d Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983).
The reasonableness of the settlement is moreover supported by the response of the class members. As earlier discussed, no formal objection to the proposed settlement has been filed, and only four letters in opposition to the settlement, each dated subsequent to the date of the settlement hearing, have been received by the Court. In addition, only two *741 members of the classes, holding 145 units in MDCIF-I out of the 171,695 total units outstanding, have opted out of a class.
Perhaps of greatest significance to the Court's endorsement of the proposed settlement is the fact that, pursuant to the consent order, the approval of the majority of the limited partners of each partnership operated as a condition precedent to the entire settlement. Plaintiffs' lead counsel has attested in his affidavit that the proposal has been approved by all of the partnerships, and that further, over 90% of the unitholders who voted consented to the proposal. See Kornreich Aff., supra, ¶ 48, at 32-33. This factor serves as `the final icing on the cake' in leading the Court to conclude that the proposed settlement is fair, reasonable, and adequate to all the class members, and therefore meritorious of approval.
As the foregoing discussion has indicated, continued litigation in the instant actions would be complex and lengthy, with no guarantee of a substantial recovery by the class members. Accordingly, in light of all the factors addressed above, including the absence of any substantial dissent among the class members, the Court finds that the proposed settlement is fair and reasonable, and therefore the Court approves it.

II. Attorney's Fees

Plaintiffs' counsel submits a joint request for an award of attorney's fees in the amount of $4,000,000, and reimbursement of plaintiffs' litigation expenses in the amount of $68,604.42. Although, as earlier indicated, the Court's disposition of this request awaits the submission of additional information by plaintiffs' counsel so as to enable the Court to compute a fair and equitable fee award, a discussion of the governing legal principles is nevertheless provided to guide the parties in connection with the ordered submissions.
Under the common fund exception to the American Rule against court awarded attorney fees, the court, in exercise of its general equitable powers, apportions "the plaintiff's attorney fees among those persons who have benefited from the plaintiff's litigation to create, preserve, [or] protect" a fund by charging the fees against such fund. 1 Mary F. Derfner & Arthur D. Wolf, Court Awarded Attorney Fees 2-1 (Rel. 17, 1993). See Breiterman v. Roper Corp., [1989-1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,885, at 94,832, 1990 WL 15535 (S.D.N.Y. Jan. 12, 1990) (quoting Desimone v. Industrial Bio-Test Laboratories, Inc., 83 F.R.D. 615, 621 (S.D.N.Y.1979)); see also Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980) (lawyer who recovers common fund for benefit of persons other than himself is entitled to reasonable attorney's fee from fund). The equitable assessment and apportionment of fees upon a fund is designed to prevent the unjust enrichment of persons, including members of a plaintiff class, who would otherwise reap the benefits of the litigation without bearing its costs. Where an equitable fund is created through the settlement of a class action suit, the court, as guardian of the rights of the class members, is not bound by the amount of the fee award that counsel has requested. This is so even though notice of the fee request has been provided to all class members so as to afford them a sufficient opportunity to object. See Piambino v. Bailey, 610 F.2d 1306, 1328 (5th Cir.) (district court not bound by agreement of parties as to amount of attorney's fees in settlement of class action), cert. denied, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980); 1 Derfner & Wolf, supra, ¶ 6.02, at 6-12.3.
Under the law of the Second Circuit, the lodestar method is the proper approach for computing the assessment of attorney's fees against an equitable fund. Historically, fees in common fund cases had been computed as a percentage of the fund. See Breiterman, [1989-1990 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 94,885, at 94,832 (citing Mashburn v. National Healthcare, Inc., 684 F.Supp. 679, 688 (M.D.Ala.1988)). The application of the percentage method, however, lent itself to arbitrary  and often quite exorbitant  fee awards that sometimes failed to accurately reflect the time and energy spent by plaintiff's counsel, the quality of the representation, and the stage in the litigation process at which a settlement was achieved. In addition, the public perception that `windfall fees' were being awarded left many critics *742 to lament that "`the only persons to gain from a class suit are not the potential plaintiffs, but the attorneys who will represent them.'" City of Detroit v. Grinnell Corp., 495 F.2d 448, 469 (2d Cir.1974) (quoting Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 571 (2d Cir.1968) (Lumbard, J., dissenting)). In response to these concerns, a major jurisprudential shift was inaugurated in Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 166-67 (3d Cir.1973), in which the Court of Appeals for the Third Circuit adopted what is commonly described as the "lodestar" analysis. The lodestar approach was thereafter employed in a common fund case by the Second Circuit Court of Appeals in City of Detroit v. Grinnell Corp., 495 F.2d 448, 470-71 (2d Cir.1974), and last year, was expressly enunciated as the law of the Second Circuit in Grant v. Martinez, 973 F.2d 96, 99 (2d Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993).
Under the lodestar approach, the court computes a `lodestar' by multiplying the number of hours reasonably expended in litigation by a reasonable hourly rate. See id. These variables are ascertained through the court's review of contemporaneous time records and expense reports submitted by counsel that provide brief descriptions of the purpose of the work performed and the expenses incurred. See Gucci Am., Inc. v. Rebecca Gold Enters., 89 Civ. 4736 (BN), 1993 WL 88270, at *3 n. 2, 1993 U.S.Dist. LEXIS 3486, at *8 n. 2 (S.D.N.Y. Mar. 23, 1993) (citing Lewis v. Coughlin, 801 F.2d 570, 577 (2d Cir.1986)). The Second Circuit has granted the district courts considerable latitude in protracted litigation, such as the instant actions, to apply counsel's current hourly rates in computing the lodestar so as to compensate counsel for the time value of money (i.e., the interest cost) attributable to the delay between the time that legal services are rendered and such time that payment is ultimately received from the common fund. See Grant, 973 F.2d at 100 (citation omitted). The court may then adjust the lodestar up or down by the application of a multiplier based upon certain factors, the most prominent of which is an adjustment for the risk of loss associated with the undertaking of representation on a contingent basis. This enhancement for risk of loss  that is, the risk that no equitable fund will be created out of which attorney's fees may be paid, either through a victory on the merits, or through a court-approved settlement  is necessary to equate an attorney's hourly billing rates (which are premised upon the assumption that the attorney will be fully compensated for the services she performs) to a risk-adjusted rate that considers the substantial possibility that the plaintiff will neither prevail on the merits nor reach a settlement. Needless to say, in a contingent fee arrangement, if a judgment were entered against the class action plaintiffs, no fund would be created out of which the attorney could be compensated for the time and effort that he or she had invested in prosecuting the case.
The use of a risk enhancement adjustment is appropriate where attorney's fees are to be paid from an equitable fund created through litigation. While the Supreme Court has expressly prohibited post-lodestar risk enhancement adjustments in fee petitions brought pursuant to fee-shifting statutes, see City of Burlington v. Dague, ___ U.S. ___, ___ - ___, 112 S.Ct. 2638, 2643-44, 120 L.Ed.2d 449 (1992), neither the Supreme Court nor the Second Circuit has extended this interdiction to common fund cases. In addition, in Grant v. Martinez, 973 F.2d 96 (2d Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993), the Second Circuit Court of Appeals, in commenting upon Burlington, expressly stated that "[a]lthough there is a `strong presumption that the lodestar figure represents the reasonable fee,' other considerations may lead to an upward or downward departure from the lodestar." Id. at 101 (quoting Burlington, ___ U.S. at ___, 112 S.Ct. at 2641) (additional citation omitted). Aside from the equitable considerations noted in the preceding paragraph that underscore the fundamental fairness of adjusting the lodestar to compensate counsel for otherwise unremunerated risk, the Court notes that many of the policies that have motivated Congress to enact fee-shifting statutes  including the encouragement of litigation to achieve social goals in consonance with civil rights legislation  *743 are simply not applicable to a district court's computation of a reasonable attorney's fee to be assessed against an equitable fund. Finally, the Court does not ignore the fact that, in contrast to fee-shifting statutes  which are enactments of the legislative branch, and therefore implicate questions of statutory interpretation as to whether Congress intended a particular statute to shift liability for the plaintiff's attorney's fees from the prevailing plaintiff to the defendant  the common fund doctrine is an entirely different animal that derives from the courts' equitable impulses to prevent the unjust enrichment of the beneficiaries of another person's litigation. Therefore, the Court concludes that Burlington's admonition against a post-lodestar adjustment for risk does not apply to an award of attorney's fees payable out of an equitable fund created through litigation. The Court does recognize, however, that all other factors that bear on the ultimate fee award, including the quality of representation, the complexity of the litigation, the delay in the receipt of payment, and the skillfulness of opposing counsel, are properly includable in the computation of the lodestar amount.
The Court is further of the opinion that the risk enhancement factor lends itself to mathematical equation. As the Supreme Court acknowledged in City of Burlington v. Dague, ___ U.S. ___, ___, 112 S.Ct. 2638, 2642, 120 L.Ed.2d 449 (1992), in a contingent fee arrangement, "the attorney bears a contingent risk of nonpayment that is the inverse of the case's prospects of success: if his client has an 80% chance of winning, the attorney's contingent risk is 20%." Id. The risk enhancement factor may thus be computed by dividing 1 by the difference between 1 and that decimal which represents the contingent risk. For example, returning to the Supreme Court's illustration in Burlington, if, at the outset of litigation, the Court were to adjudge that there was a 20% (0.2) risk that the plaintiffs would lose their lawsuit outright  that is to say, that plaintiffs would neither prevail on the merits nor settle  the risk enhancement factor would be 1.25, computed as follows:
 1.0 = 1.0 = 1.25
 ________ ___
 1.0 - 0.2 0.8
Therefore, consistent with the Court's inquiry into counsels' contingent risk in each of the instant consolidated actions, both at the outset of litigation, and also throughout its course, the Court requests affidavits from counsel in each of the instant actions to enable the Court to determine the appropriate risk enhancement factor.[10]
Thus, in accordance with the preceding analysis, the Court orders plaintiffs' counsel to submit the following information so as to enable the Court to compute a fair and equitable award of attorney's fees from the fund to be created through this Memorandum and Order: (i) contemporaneous time records and expense reports, and (ii) affidavits concerning counsels' perceived risk of loss at the time that they undertook representation in the respective consolidated actions, and addressing whether, and to what extent, such perceived risk of loss changed over each six-month interval during the course of litigation.[11]

CONCLUSION
The proposed settlement is approved. Fed.R.Civ.P. 23(e). The joint application by plaintiffs' counsel for an award of attorney's fees is held in abeyance pending counsels' submission of (i) contemporaneous time records and expense reports, and (ii) affidavits concerning counsels' perceived risk of loss as of the commencement of the respective consolidated actions, and at each six-month anniversary from the commencement date of litigation, *744 so as to assist the Court in computing a fair and equitable fee award.
SO ORDERED.
NOTES
[1] Gruntal is a defendant only in the Carpi action.
[2] According to plaintiffs' lead counsel, the difference in the percentage of recovery between members of the MDCIF-I and Troy classes reflects the fact that the contribution of Gruntal is being made to the MDCIF-I Class alone, because Gruntal is a defendant only in the Carpi action, which was filed solely on behalf of the MDCIF-I Class.
[3] The Court notes that the stated percentage recoveries of initial investment by the limited partners do not reflect a further potential reduction for the $68,604.42 of plaintiffs' litigation expenses for which plaintiffs' counsel has petitioned for reimbursement. However, given that plaintiffs' lead counsel asserts that the $1,375,000 to be paid by Gruntal only accounts for a 1.82% differential (97.44% minus 95.62%) in the aggregate nominal returns of capital to be received by the MDCIF-I and TLIF class members assuming that the requested $4,000,000 fee award is granted, see Kornreich Aff., supra, ¶ 39, at 29, the Court does not view this amount to be sufficiently material to alter its conclusion as to the fairness of the settlement.
[4] The consent order modified the definition of the class certified in the Carpi action to include:

all persons (other than defendants, members of the immediate families of the individual defendants and trusts, companies or entities they control) who presently own, or at any time owned, units of limited partnership interest in McDonnell Douglas Capital Income Fund-I (the "MDCIF-I Class").
In re McDonnell Douglas Equip. Leasing Sec. Litig., MDL No. 873 (S.D.N.Y. June 14, 1993) (consent order).
[5] The consent order modified the definition of the class certified in the Edelman action to include:

all persons (other than defendants, members of the immediate families of the individual defendants and trusts, companies or entities they control) who presently own, or at any time owned, units of limited partnership interest in the Troy Lease Income Fund (the "TLIF Class").
In re McDonnell Douglas Equip. Leasing Sec. Litig., MDL No. 873 (S.D.N.Y. June 14, 1993) (consent order).
[6] As discussed supra, subsequent to the date of the settlement hearing, four separate letters were submitted by persons objecting to the proposed settlement and plaintiffs' counsels' joint petition for attorney's fees and expenses.
[7] Section 12 of the Securities Act of 1933, 15 U.S.C.A. § 771 (West 1981), provides as follows:

Civil liabilities arising in connection with prospectuses and communications:
Any person who 
(1) offers or sells a security in violation of section 77e of this title, or
(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
15 U.S.C.A. § 77l (West 1981).
[8] In his affidavit in support of the proposed settlement, plaintiffs' lead counsel has cited a number of defenses asserted by the defendants for which discovery and motion practice has revealed possible factual and legal underpinnings. These include the defendants' contentions that the statements in the offering materials were truthful when made and adequately disclosed the risks of investing in the partnerships, and their assertion that the decline in the price of the partnership units was primarily due to factors unrelated to the alleged wrongdoing. According to plaintiffs' lead counsel, discovery supported defendants' contentions that (i) the computer leasing industry, including a number of computer equipment leasing partnerships, declined in the last several years due, in part, to the countrywide recession and the introduction of newer, more efficient computer-related equipment; (ii) the offering materials, especially the prospectuses, contained cautionary language disclosing risks of investing in the partnerships and the general partner's right to use leverage; and (iii) the targeted monthly distributions and projected residual values were supported by independent appraisals. See Kornreich Aff., supra, ¶¶ 52-54, at 34-36.
[9] In addition, as earlier discussed, without considering reductionary adjustments attributable to the time value of money, plaintiffs' lead counsel, in his affidavit supporting the proposed settlement, has attested that by adding together (1) the amount of monthly distributions previously received by the limited partners, plus (2) the amount of the liquidating distribution that the class members are expected to receive pursuant to the settlement, plus (3) the amount of the fund made available as a result of the settlement, members of the MDCIF-I Class will have recovered 97.44% of their, initial investment in MDCIF-I, and that members of the TLIF Class will have recovered 95.62% of their capital investment in TLIF net of the petitioned $4,000,000 attorney's fee award. See Kornreich Aff., supra, ¶ 39, at 29.
[10] A risk analysis has been used to elucidate the rights of parties in other areas of law as well. Most recently, one author has suggested a risk analysis in exacting the economic position of a contracting party where the party with whom he has dealt has breached such agreement. See generally William J. Geller, Note, The Problem of Withholding in Response to Breach: A Proposal to Minimize Risk in Continuing Contracts, 62 Fordham L.Rev. 163 (1993).
[11] It would therefore be helpful to the Court if counsel could summarize their time record data, organized both by individual lawyer/paralegal/law clerk and on an aggregate basis, over six-month intervals. By so doing, the Court will be able to apply a separately computed risk enhancement factor to `sub-lodestars' computed for each six-month period during litigation.